## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:22-cr-00018-RDP-SGC** |
| | } | |
| **RODERICK PRICE CUMMINGS** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION & ORDER</u>

This matter is before the court on Roderick Price Cummings's Motion to Dismiss for Pre- and Post-Indictment Delay. (Doc. # 16). The Motion is fully briefed and ripe for review. (Docs. # 16, 24, 32, 34, 35, 36, 37). For the reasons discussed below and with the benefit of oral argument, the Motion (Doc. # 16) is due to be denied.

## I.    Background

### A.    General Background

On February 24, 2020, Roderick Price Cummings ("Defendant") was initially arrested on a charge of possessing cocaine and marijuana, which police officers at the scene of the arrest found in his car. (Doc. # 16 at 1). Once Defendant was taken into custody, officers searched him at the jail,[1] and purportedly discovered a gun when Defendant was changing into jail attire in a restroom. (Doc. # 16 at 2; Doc. # 34, p. 8:1-11). On May 26, 2020, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Task Force Officer James R. Keith prepared a report of investigation that indicated that Defendant possessed a firearm on this occasion. (Doc. # 16-2).

---

[1] Defendant contends that the arresting officers also searched him twice at the scene of the arrest, but no weapon was located at that time. (Doc. # 16 at 1-2; 16-1).

On January 25, 2022, a Northern District of Alabama Grand Jury returned an Indictment against Defendant (Doc. # 1) for violating 18 U.S.C. § 922(g)(1), which prohibits a convicted felon from being in possession of a firearm. The Government contends that at the time of his arrest, Defendant had been convicted of one count of First-Degree Theft of Property and three counts of First-Degree Robbery, with each offense punishable by imprisonment for a term exceeding one year. (Doc. # 24). On January 30, 2024 – after Defendant was arrested by the United States Marshals Service ("USMS") – he appeared before the Honorable Judge Nicholas A. Danella where he was advised of his rights and the charge against him. (Minute Entry, Jan. 30, 2024).

Defendant filed this Motion to Dismiss on April 15, 2024, asserting that the Indictment is due to be dismissed because of unconstitutional delays before and after the Indictment's filing. (Doc. # 16).

### B.    Evidence Presented

On July 24, 2024, the court held an evidentiary hearing to address the issues raised in Defendant's motion. (Doc. # 34).

The Government first called ATF Task Force Officer James R. Keith to testify. (Doc. # 34, pp. 32-97). Officer Keith testified to the following facts:

- Defendant's case was assigned to Officer Keith on March 24, 2020. (Doc. # 32 at 1; Doc. # 34, p. 36:2-10). However, Officer Keith was potentially aware that Defendant's case had a federal nexus (meaning it had the potential to result in a federal indictment) as early as February 2020. (Doc. # 34, pp. 49:23-51:4, 52:22-25; 57:20-22; 95:24-96:2).

- On May 26, 2020, Officer Keith took four actions: (1) he opened a federal case file on Defendant, (2) he ordered copies of certified convictions for Defendant from the Circuit Court of Jefferson County, (3) he ordered copies of Defendant's fingerprints from

2

Jefferson County, and (4) he completed the first Report of Investigation. (Doc. # 32 at 1-2). However, Officer Keith did not pull the security camera footage from the prison because the weapon was reportedly discovered in Defendant's possession while he was changing clothes in a restroom; so, Officer Keith thought the footage would provide little relevant information for the case. (Doc. # 34, pp. 60:9-62:9). Officer Keith received the fingerprints on August 26, 2020, and received the certified convictions on July 30, 2021. (Doc. # 32 at 2).

- Beginning in March 2020, the COVID-19 pandemic affected Officer Keith's ability to investigate cases. (Doc. # 34, pp. 36:22-40:11). For example, the pandemic forced those working at the ATF Office located in Birmingham to telework and schedule specific times to work in the office. (*Id.*). According to Officer Keith, it was difficult to conduct investigations while working at home because he had limited access to necessary resources and that the investigatory process was slowed down by the pandemic. (*Id.*).

- On September 16, 2021, Officer Keith submitted the case file to his superiors for final approval. (Doc. # 32 at 2).

- On December 8, 2021, Officer Keith sent the case to the U.S. Attorney's Office to refer it for prosecution. (Doc. # 32 at 2).

- Between March 2020 and December 2021, Officer Keith experienced a number of challenges: (1) he tested positive for the COVID-19 virus, for which he was required to quarantine for two weeks; (2) he took care of his sick mother who eventually passed away from COVID-19 in 2021; (3) he opened approximately twelve new cases while working on his other pending cases; (4) he assisted with other cases; and (5) he fulfilled additional duties for the Birmingham Police Department. (Doc. # 34, pp. 44:5-46:18).

The Government then called U.S. Deputy Marshal Sam Howard to the stand. (Doc. # 34, pp. 97:15-153:9). Deputy Howard testified to the following facts:

- On January 25, 2022, the Government charged Defendant in a one-count Indictment alleging that he possessed a firearm knowing he previously had been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). (Doc. # 32 at 2).

- The warrant, which was based on Defendant's federal Indictment, was turned over to USMS on January 26, 2022. (Doc. # 32 at 2). Between January 31, 2022, and February 2, 2022, Defendant's warrant was entered by USMS personnel into the National Crime Information Center ("NCIC"). (Doc. # 34, p. 99:15-18). USMS officially accepted apprehension authority on February 2, 2022. (Doc. # 32 at 2).

- In early 2022, the nation and the State of Alabama were still emerging from the COVID-19 pandemic shutdown.

- Defendant's Indictment was under seal until his arrest. (Doc. # 3) (Order Granting Motion to Seal Indictment).

- During the pendency of this case, three different deputies were assigned as lead investigator on Defendant's case: Former Deputy Marshal Tomeka Bryant (who served from February 2022 until July 2022), Deputy Marshal Jason Boehm (who served from July 2022 until June 2023), and Deputy Howard (who served from June 2023 until January 2024). (Doc. # 34, pp. 99:25-100:17).

- Other than preliminary steps, including entry of the warrant into the NCIC, little is known about what former Deputy Bryant did as lead investigator in the first half of 2022. Deputy Howard could not locate any report or documentation indicating her efforts. (Doc. # 34, p. 111:5-19).

- During the twelve months that Deputy Boehm was lead investigator on the matter, he had several additional responsibilities. Deputy Boehm continued to work on other cases (Doc. # 34, p. 101:7-14), fulfilled other responsibilities as a Deputy Marshal (*id.* at pp. 98:15-21, 101:18-102:15), assisted with an international extradition (*id.* at pp. 102:18-103:3), and was assigned to work on the southern border (*id.* at p. 104:9-19). Deputy Boehm also had surgery and was placed on "light-duty status" for some time period (*Id.* at p. 103:17-25).

- During the first two weeks of July 2022, USMS deputies conducted surveillance of the Dunbar Court address listed on the arrest warrant for Defendant's federal Indictment. (Doc. # 32 at 2). Deputies ran the tag of a Dodge Charger parked near the residence through NCIC, but discovered it belonged to one of the residents, not Defendant. (*Id.* at 2-3).

- In August 2022, deputies surveilled the Ninth Avenue address that was also associated with Defendant. (*Id.* at 3). After speaking with the apartment complex, the deputies learned that Defendant was not listed on the lease for that residence. (*Id.*). Deputies ran the tag of a Hyundai Sonata at this residence, but discovered that the owner was not Defendant. (*Id.*).

- During his time as lead investigator, Deputy Howard also had additional responsibilities, such as working on other cases (Doc. # 34, p. 101:15-17), functioning as a Deputy Marshal (*id.* at pp. 98:15-21, 101:18-102:15), and assisting with an international extradition (*id.* at pp. 102:18-103:3). At times during this period, the USMS stationed in Birmingham spent more time in the courtroom than on the street due to limited personnel resources. (*Id.* at pp. 108:6-110:6).

- When he was not surveilling, Deputy Howard continued to search for Defendant by utilizing "open-source tools." These tools included Accurint, Clear (an Alabama-specific database), and other platforms that permit searches for information. (Doc. # 34, pp. 114:25-115:9). Deputy Howard did not use, nor has he ever used, AlaCourt to search for information. (*Id.* at p. 115:4-13).

- On July 20, 2023, USMS deputies once again surveilled the Dunbar Court address. The deputies observed a Hyundai Elantra parked in the driveway with three people in the car. (Doc. # 32 at 3; Doc. # 34, p. 129:1-9). The deputies did not know who the occupants of the car were or whether they were connected to Defendant. (Doc. # 32 at 3).

- On September 13, 2023, USMS deputies conducted another surveillance at the Dunbar Court address. (*Id.*). On this date, the deputies did not observe any activity. (*Id.*). That same day, the deputies went to the Little Drive address – an address Deputy Howard found while using open-source tools. (Doc. # 34, pp. 131:18-132:12). After surveilling the address, the deputies spoke with the Jefferson County Housing Authority to see if anyone had information on or knowledge of Defendant. (Doc. # 32 at 3).

- On October 26, 2023, USMS deputies received a phone call from a leasing clerk with the Jefferson County Housing Authority who confirmed that Defendant's daughter lived at the Little Drive address. (*Id.* at 3-4; Doc. # 34, pp. 132:11-135:2). The leasing clerk spoke with Defendant's daughter who indicated that Defendant was living with his girlfriend in Carriage Hills. (Doc. # 32 at 3-4). Deputy Howard noted that talking with people about an under-seal warrant carries the risk a defendant will learn of the

efforts to find him, which could have adverse consequences in making the arrest. (Doc. # 34, p. 141:2-10).

- Although he is unsure when this surveillance took place, once Deputy Howard learned about Defendant's potential new residence, he and other deputies visited the Carriage Hills neighborhood. (Doc. # 34, pp. 135:16-136:12).

- On January 5, 2024, deputies surveilled the Little Drive address again. (Doc. # 32 at 4). The deputies did not observe any activity. (*Id.*). On the same day, deputies spoke with an anonymous source who directed the deputies to a Citgo gas station in Bessemer, Alabama. (*Id.*). The deputies investigated this lead, and then met with the Bessemer Housing Authority. (*Id.*). The Bessemer Housing Authority informed the deputies that they were aware of Defendant but that he was not listed on a lease with them. (*Id.*).

- On January 29, 2024, deputies visited a different Little Drive address belonging to the mother of Defendant's daughter. (*Id.*). The deputies spoke with the mother of Defendant's daughter, who stated that she no longer speaks to Defendant. (*Id.*). However, she told the deputies that her daughter does speak with Defendant. (*Id.*). Deputies then spoke with Defendant's daughter. (*Id.*). Defendant's daughter stated that Defendant was in a rehabilitative treatment center in Anniston, Alabama. (*Id.*). Defendant's daughter called Defendant, and he agreed to speak with the deputies. (*Id.*). Defendant told the deputies that he was at the Center of Hope Ministry Rehabilitation Center. (*Id.*).

- The same day, Deputy Howard contacted the Anniston division of the USMS, who arrested Defendant at the Center of Hope. (*Id.*).

- No deputy made contact with Defendant's daughter before January 29, 2024. However, as Deputy Howard explained: "If you're going to conduct an interview at an address that you think may reasonably lead you to the target, you're going to have to have more assets. And so a lot of times we're limited with the asset because we don't have the numbers to safely and effectively conduct that interview or arrest." (Doc. # 34, p. 117:3-8).

- During his investigation, Deputy Howard did not investigate whether Defendant had any state court dates because Deputy Howard believed that information tends not to be helpful. (Doc. # 34, pp. 143:19-144:7).

- The parties stipulated to the fact that Defendant was admitted to the Center of Hope and that Defendant's progress at the Center of Hope was faxed to his state parole officer. However, the parties dispute whether this information was actually received by Defendant's parole officer and whether he was aware of the information. (Doc. # 34, pp. 154:9-159:12).

## II.    Legal Standard

Federal Rule of Criminal Procedure 12 allows a defendant to bring a pretrial motion challenging a criminal indictment. Fed. R. Crim. P. 12(b)(3). A court may dismiss a criminal indictment for pre-indictment delay or a violation of the constitutional right to a speedy trial (also called post-indictment delay). Fed. R. Crim. P. 12(b)(3)(A)(ii)-(iii). The differing standards governing issues of pre-indictment delay and post-indictment delay are discussed below.

### III.   Discussion

Defendant argues that the charge in the Indictment is due to be dismissed because the Government's delay, both pre-indictment and post-indictment, violated his due process rights. The court examines both of those claims below.

### A.      Pre-Indictment Delay

The limit on a pre-indictment delay is typically set by the statute of limitations, which is the primary safeguard against prejudicial delay. *United States v. Marion*, 404 U.S. 307, 322 (1971). There are, however, certain instances in which an indictment itself satisfies the statute of limitations, but a delay in obtaining the indictment may still violate a defendant's due process rights. A defendant making a claim that he experienced an unconstitutional pre-indictment delay must show (1) actual prejudice from the delay *and* (2) that the delay resulted from a deliberate design by the Government to gain a tactical advantage. *United States v. Gouveia*, 467 U.S. 180, 192 (1984); *United States v. Thomas*, 62 F.3d 1332, 1339 (11th Cir. 1995). As explained below, Defendant's pre-indictment delay claim is a non-starter because he does not allege – and certainly cannot show – that any pre-indictment delay is a result of the Government's deliberate design to gain some tactical advantage against him.

Defendant's argument in support of his pre-indictment delay claim is this: there is a split among the circuits as to the proper test to apply to such claims. (Doc. # 16 at 3). Although most circuits require a defendant to show both (1) actual prejudice caused by the delay, and (2) improper motive, such as tactical advantage, by the prosecution, there is a minority view. (*Id.*). The minority view requires a defendant to establish the first element, but it substitutes a balancing test in place of the second one. (*Id.*). That balancing test pits "the defendant's prejudice against the

[G]overnment's justification for delay." (*Id.*) (quoting *Howell v. Baker*, 904 F.2d 889, 895 (4th Cir. 1990)). Defendant argues the minority view is the better of the two. (*Id.*).

When there is a circuit split, and our circuit has weighed in on that split, this court simply is not at liberty to evaluate which is the better view. Rather, it is obliged to follow Eleventh Circuit law. No case law citation is necessary to support such a tautological proposition.

Defendant suggests that our circuit precedent actually places it in the minority view. He contends that a former Fifth Circuit case adopted a balancing test to determine if there has been pre-indictment delay. (Doc. # 16 at 3). But that argument suffers from the same defect as bad plumbing – it does not hold water.

Defendant cites to a footnote in a former Fifth Circuit case, *United States v. Brand*, to support this assertion. 556 F.2d 1312, 1317 n.7 (5th Cir. 1977). The Fifth Circuit panel in *Brand* dropped a footnote in its opinion that stated:

> Whether the claim is valid depends on the due process balancing between the extent of the actual prejudice and the governmental interests at stake. [*United States v. Lovasco*, 431 U.S. 783 (1977)] does not indicate that governmental interests not amounting to an intentional tactical delay will automatically justify prejudice to a defendant. On the contrary, the Court engages in a sensitive balancing of the [G]overnment's need for an investigative delay in Lovasco against the prejudice asserted by the defendant.

556 F.2d at 1317 n.7. Seizing on this footnote, Defendant contends that in *Brand* the former court of appeals adopted what is now the minority view, and that this court must apply the balancing test rather than the two-part test requiring intentional delay because that decision is precedential.[2] This is more bad plumbing for at least two reasons. First, the Eleventh Circuit has never recognized the *Brand* footnote as adopting a different test than the one it has consistently applied. Second, even the Fifth Circuit has recognized that *Brand* did not adopt a balancing test rule.

---

[2] *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (holding that decisions by the Fifth Circuit prior to close of business September 30, 1981 are binding on the Eleventh Circuit).

Regarding that second point, the Fifth Circuit clarified the proper weight this footnote should hold: "We did not there engage in any such balancing . . . for we had already found no actual prejudice (nor did we even identify or assess the reasons for the delay or 'the governmental interests at stake'). *The* Brand *footnote [7] is pure dicta*." *United States v. Crouch*, 84 F.3d 1497, 1509 (5th Cir. 1996) (emphasis added). Therefore, the two-part test on which the Eleventh Circuit has consistently relied remains the applicable test. *See United States v. Barragan*, 752 F. App'x 799, 801 (11th Cir. 2018) (finding that *Brand* contradicts subsequent Eleventh Circuit and Supreme Court precedent).

It follows that both prongs of the two-part test must be satisfied for relief to be available to a defendant. Because Defendant concedes here that he is not claiming any deliberate design or intentional delay by the prosecution (*i.e.*, the first prong), *see United States v. Gouveia*, 467 U.S. 180, 192 (1984), the court need not address prejudice (the second prong). *E.g.*, *United States v. Thomas*, 62 F.3d 1332, 1339-40 (11th Cir. 1995) (declining to decide the prejudice prong where defendants did not meet their burden to show that a pre-indictment delay was deliberately for the purpose of tactical advantage).

Defendant asserts that pre-indictment delay caused the destruction of security camera footage that would exculpate him, or (at least) cast doubt on the Government's evidence. He further claims that this alleged destruction supports a finding of actual prejudice. But, Defendant includes no details substantiating his allegations. For example, Defendant does not say which security camera any exculpatory footage would have come from, when the security footage was "destroyed," or who destroyed the security footage. Moreover, the Government contends that the firearm in Defendant's possession was discovered by officers as they searched Defendant's person

in a restroom at the jail. Defendant does not discuss under what circumstances video footage could be captured in a restroom.

Defendant also claims that he is prejudiced because the delay interrupted his attempt to rehabilitate. In early 2023, Defendant enrolled himself in a treatment program at the Center of Hope, a rehabilitation center located in Anniston, Alabama. Before he was able to finish that program, Defendant was arrested on this federal Indictment. After careful review, the court concludes that this argument fails to account for an undisputed fact: on May 2, 2024, Defendant was released into the custody of Archie "AJ" Thomas, a Pastoral Counselor for the Center of Hope. Thus, Defendant was able to resume his rehabilitation efforts, negating any prejudice his arrest may have had on such efforts. Further, and in any event, to the extent Defendant asserts that he should have been arrested and served with a federal indictment earlier, that also would have interfered with his rehabilitation – perhaps even more so.

Courts do not provide relief for a pre-indictment delay unless there is evidence – not conclusory allegations or moot arguments – of actual prejudice. *See United States v. Hayes*, 40 F.3d 362, 366 (11th Cir. 1994) ("This court has consistently held that conclusory assertions of prejudice . . . are insufficient to constitute proof of actual prejudice."); *see also United States v. Young*, 906 F.2d 615, 620 (11th Cir. 1990) ("[The defendant's] conclusory allegations of prejudice are insufficient to establish actual prejudice."). Defendant has failed to point to any evidence showing that he has suffered actual prejudice from any purported pre-indictment delay.

Defendant's argument runs onto the rocks of another deficiency. He cannot come even close to establishing the second element. He has not explained how any delay resulted from a deliberate plan by the Government. Rather than illustrating how the pre-indictment delay was part of an intentional plan, Defendant merely asserts that the Government gained a tactical advantage

by forcing Defendant to litigate a stale claim. Even in saying this, Defendant has not plausibly claimed that the delay was part of any deliberate plan. *See Thomas*, 62 F.3d at 1339-40. In fact, Defendant argues the exact opposite, stating that "certain aspects of the delay did in fact give the Government a tactical advantage, but [Defendant is] not alleging that the Government deliberately did that." For these reasons, Defendant has not met his burden to establish prejudice warranting dismissal of the Indictment for pre-indictment delay.

### B. Post-Indictment Delay

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. In analyzing a post-indictment delay under the constitutional standard, a court must consider four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) the actual prejudice borne by the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *see also United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006) (applying the *Barker* factors). Unless the first three factors weigh *heavily* against the Government, Defendant must show the fourth factor of actual prejudice. *United States v. Harris*, 376 F.3d 1282, 1290 (11th Cir. 2004). Thus, the court must determine whether the first three factors weigh against the Government at all, and if so, must ask another question: do they weigh *heavily* against the Government? *See United States v. Olivia*, 909 F.3d 1292, 1298 (11th Cir. 2018). The court addresses each of these factors below.

### 1. Length of Delay

"The first factor, length of the delay, serves a triggering function: it must first be satisfied for the court to analyze the other factors." *Olivia*, 909 F.3d at 1298. A post-indictment delay exceeding one year will generally satisfy the first factor. *Id.* "Only pretrial delay following a

person's arrest, charge, or indictment is relevant to whether the Sixth Amendment analysis is triggered." *United States v. Kelly*, No. 21-10351, 2021 WL 6143554, at *1 (11th Cir. Dec. 30, 2021) (citing *United States v. Ingram*, 446 F.3d 1332, 1337 (11th Cir. 2006)).

Here, the delay between the Indictment and Defendant's arrest was two years. (Doc. # 32 at 2, 4). The parties do not dispute that a two-year delay is long enough to be presumptively prejudicial and to thus trigger the balance of the *Barker* analysis. However, a court cannot find that Defendant's Speedy Trial right was violated based on the length of the delay alone. Indeed, in cases with delays longer than two years, the Eleventh Circuit has found no violation of the Speedy Trial violation. *See, e.g.*, *United States v. Villarreal*, 613 F.3d 1344, 1351 (11th Cir. 2010) (delay of ten years); *United States v. Vargas*, 97 F.4th 1277, 1289 (11th Cir. 2024) (delay of thirty-five months); *United States v. Stapleton*, 39 F.4th 1320, 1327-28 (11th Cir. 2022) (delay of almost four years); *United States v. Machado*, 886 F.3d 1070, 1077 (11th Cir. 2018) (delay of over five years); *United States v. Register*, 182 F.3d 820, 827 (11th Cir. 1999) (delay of thirty-eight months). And as discussed below, in this case the two-year delay is not surprising given the circumstances of the COVID-19 pandemic. Further, in cases with a delay of a similar length (twenty-three months), the Eleventh Circuit has found that this factor did not weigh heavily against the Government. *See United States v. Olivia*, 909 F.3d 1292, 1292 (11th Cir. 2018); *see also Doggett v. United States*, 505 U.S. 647, 652 (1992) (reasoning that the "presumption that pretrial delay has prejudiced the accused intensifies over time"). Given the two-year length of the delay, although the first factor weighs against the Government, it does not weigh heavily. Accordingly, the court considers the remaining factors.

      **2.**      **Reason for Delay**

The Government has a duty to make "a diligent, good-faith effort to bring [a defendant] before the [] court for trial." *Smith v. Hooey*, 393 U.S. 374, 383 (1969); *see also Vargas*, 97 F.4th at 1287 ("We've emphasized that the Sixth Amendment requires only a diligent, good-faith effort on behalf of the government to locate and bring a defendant to trial.") (appeal pending).

To determine the weight to give this factor, the court must determine the weight to give each proffered reason for the delay. "Different reasons for delay are accorded different weights." *Olivia*, 909 F.3d at 1301 (citing *Barker v. Wingo*, 407 U.S. 514, 531 (1972)). The Eleventh Circuit in *Olivia* contrasted the two extremes of "[a]n intentional attempt to delay trial in order to hinder the defense," which "is 'weighted heavily against the [G]overnment,'" *id.* (internal citation removed), and "a valid excuse, such as a missing witness," which justifies reasonable delay." *Id.* The *Olivia* panel then noted: "Negligence falls between these two extremes. It is 'more neutral' and 'should be weighted less heavily' than bad-faith acts." *Id.* The panel concluded "[o]ur 'toleration of negligence varies inversely with the length of the delay' that the negligence causes." *Id.* at 1302 (internal citation removed). As the Eleventh Circuit has stated elsewhere, "[n]eutral reasons – including negligence or overcrowded courts – weigh less heavily against the government but still should be considered because the ultimate responsibility for the circumstances rests with the government and not the defendant." *United States v. Kelly*, No. 21-10351, 2021 WL 6143554, at *1 (11th Cir. Dec. 30, 2021).

In other words, when the delay is a result of the Government's bad faith, the court is more likely to find that this factor weighs heavily against the Government. But, "if the [G]overnment [has] diligently pursued prosecution, and had good faith reasons for delaying the trial, the defendant's Sixth Amendment claim [will generally] fail, unless he can show actual prejudice to

his defense." *United States v. Marshall*, 360 F. App'x 24, 26 (11th Cir. 2010) (citing *Doggett*, 505 U.S. at 656). If the delay is a result of the defendant's bad conduct (such as knowingly evading arrest) this also weighs in favor of the Government. *See United States v. Villarreal*, 613 F.3d 1344, 1351-52 (11th Cir. 2010). Regardless of the reasons provided, though, "[t]he Government bears the burden of explaining pre-trial delay." *Id.*

Most of Defendant's arguments in support of dismissal for post-indictment delay rest on this second factor. Before analyzing Defendant's arguments, the court notes that the Government does not argue that the delay is a result of Defendant avoiding arrest. (Doc. # 34, pp. 23:21-24:4). Nor does Defendant assert that the post-indictment delay is a result of bad faith by the Government. (Doc. # 34, p. 23:15-21). The question remains whether the Government acted justifiably or negligently with respect to the post-indictment delay. Should the court conclude that the Government acted negligently, the question becomes whether that negligence should weigh *heavily* against the Government.

Defendant argues that the Government was not reasonably diligent in locating Defendant after his Indictment. Defendant specifically argues that the initial five-month delay between when the USMS accepted responsibility for serving Defendant's warrant (February 2022) and when it was reassigned to a different U.S. Marshall (June 2022) "constitutes negligence." (Doc. # 36 at 20-21). Further, Defendant argues that, at a minimum, the USMS should have known about and attended Defendant's state court hearing date (Doc. # 34, pp. 149:25-150:4), noticed that Defendant had a state parole violation warrant (information Defendant alleges should have been on the NCIC report at the time the USMS pulled it), and talked with Defendant's parole officer to uncover where Defendant was. (Doc. # 36 at 22). The Government concedes that the USMS was unaware of Defendant's state court hearing. (Doc. # 34, p. 143:14-18). USMS Deputy Sam Howard

also testified that the USMS was unaware of Defendant's state parole violation. (Doc. # 34, p. 142:15-17). But there is no evidence at all (in fact, Defendant does not even argue) that this lack of awareness was due to the Government's bad faith.

According to party stipulations, the USMS received the federal warrant for Defendant on January 26, 2022. (Doc. # 32 at 2). During the two years between the Indictment and Defendant's arrest, the USMS surveilled three addresses associated with Defendant on numerous occasions, followed several leads, and spoke with Defendant's family members in attempts to execute the arrest warrant against him. The Government sealed the Indictment to facilitate Defendant's arrest. This obviously had an effect on the steps the USMS could take publicly to locate Defendant. Defendant claims that the USMS did not do enough because it did not exhaust all available leads when attempting to locate Defendant.

Defendant also argues that if the USMS would have contacted Defendant's state parole officer, they would have learned that Defendant was enrolled in a rehabilitation program at the Center of Hope. (Doc. # 36 at 22). The evidence, however, does not support that assertion. Although Defendant claims that his state parole officer received faxed progress reports from the Center of Hope, (Doc. # 34, p. 156:8-157:23), Defendant has offered no evidence (*e.g.*, testimony from the parole officer) showing that the officer received or read these reports.

Defendant further claims that while the USMS were searching for Defendant, there was also an outstanding state court warrant for Defendant's arrest – a warrant that Defendant alleges would have given the parole officer and the USMS notice of Defendant's whereabouts. (Doc. # 36 at 22). That may or may not have been a fruitful step. At best, any such failure would, at most sound in negligence, not bad faith. The court cannot say that the USMS was negligent.

Again, and it bears repeating, at all times between Defendant's Indictment and his arrest, this case was under seal. To preserve the integrity of the sealed filing, the USMS had to operate in a way that did not compromise any of its attempts to locate Defendant. (Doc. # 35 at 16) ("USMS was limited in how open they could be when physically looking for Cummings"). Eleventh Circuit case law supports this commonsense reality of the need to preserve a sealed indictment. *See United States v. Mitchell*, 769 F.2d 1544, 1547 (11th Cir. 1985) ("The sealing of an indictment allows the government to complete an investigation properly . . . ."). Therefore, even if it were a conscious decision for the USMS to not contact Defendant's state parole officer, and even if the state parole officer knew of Defendant's exact whereabouts, the Government may still have had a good reason to not contact the officer given the fact that the Indictment was sealed.

The Government provided sufficient evidence to show "a diligent, good-faith effort" to find and arrest Defendant. *Smith v. Hooey*, 393 U.S. 374, 383 (1969). A few days before Defendant filed the pending motion, the Eleventh Circuit considered how the *Barker* factors apply to investigatory efforts akin to those used by the Government in the present case. *See United States v. Vargas*, 97 F.4th 1277, 1277 (11th Cir. 2024). The Eleventh Circuit in *Vargas* highlighted Government efforts that were consistent with a finding of diligence – efforts "like making a visit or two to the defendant's known address and entering his information into the available crime information databases." *Id.* at 1291. The panel described how the court in *United States v. Machado* upheld a finding of diligence where agents visited a defendant's home and church once each before discovering the defendant was out of the country. 886 F.3d 1070, 1077-78, 1080-81 (11th Cir. 2018). The *Vargas* panel also described how the court in *United States v. Bagga* upheld a finding of diligence where agents visited the defendant's house and his family's restaurant once each and sought information from local authorities. 782 F.2d, 1541, 1543-44 (11th Cir. 1986).

The efforts the *Vargas* court discussed mirror those made by Deputy Howard and Deputy Boehm. Indeed, the USMS in the instant case did far more than "mak[e] a visit or two to the defendant's known address," as the agents did in *Vargas*. *See* 97 F.4th at 1277. Here, the USMS visited the arrest warrant address listed for Defendant (Dunbar Court) three times. (Doc. # 32 at 2-3). They ran tag information for two different cars parked in front of this address. (*Id.* at 3). The USMS then surveilled the Ninth Avenue address that was listed on Defendant's driver's license and spoke with management at the apartment complex. (Doc. # 34, p. 114:17-24; Doc. # 32 at 3). They also surveilled an address on Little Drive twice after finding on an open-source tool that it might be connected with Defendant's daughter. (Doc. # 34, pp. 131:25-132:16). The USMS then spoke with the Jefferson County Housing Authority and discovered that Defendant might be living in the Carriage Hills community, and later surveilled this area as well. (Doc. # 32 at 3-4; Doc. # 34, pp. 135:13-136:22). Not only that, but the USMS spoke with the Bessemer Housing Authority staff about where Defendant might live. (*Id.* at 4). And, immediately after the warrant was assigned to the USMS, Defendant's information was entered into NCIC, just as the agents in *Vargas* entered the defendant's information into available crime information databases. *See Vargas*, 97 F.4th at 1277. As apparent from Eleventh Circuit precedent, Deputy Howard and Deputy Boehm conducted their search for Defendant in good faith and with due diligence.

While Defendant contends that the Government left several stones unturned, his "armchair quarterbacking" does not move the needle. The court understands that counsel must advocate zealously for their client. However, there is no sign that the USMS did not want to find Defendant, nor is there any evidence that the USMS was avoiding its duty. The evidence indicates that, for a large portion of the Government's search, Defendant was essentially residing off the grid, at an in-patient treatment facility, the Center of Hope. No one with the United States knew that Defendant

had turned himself in to the Center of Hope. So, obviously Defendant would not have been at the addresses on file, nor would he have re-surfaced between April 2023 and January 2024. Further, while Defendant was residing at the rehabilitation facility, the USMS was actively investigating Defendant's case. Again, it is not lost on the court that throughout the relevant time, Defendant's case was under seal. The USMS could not conduct a public search for Defendant and certainly could not afford to highlight their investigatory efforts without taking the risk of tipping Defendant (or those close to him) off about the charges. In such a case, there is always a risk of "losing" Defendant for much longer than two years.[3]

Even if the court were to agree with Defendant and find that the Government was not diligent in its investigatory efforts (and to be clear, the court does not agree with Defendant on that point), merely negligent efforts would not weigh *heavily* against the Government. *See United States v. Bibb*, 194 F. App'x 619 (11th Cir. 2006). In *Bibb*, the Government had the defendant's home address, telephone number, and place of work, but still claimed that ATF officials were unable to locate him, resulting in a seventeen-month delay. *United States v. Bibb*, No. 2:03-cr-00620-JHH-TMP, at 6 (Doc. # 17) (N.D. Ala. Aug. 23, 2005). However, the Government did list the defendant's information on NCIC and agents visited an address associated with the defendant on several occasions before determining that no one lived there. *Id.* The district court thus found that "[t]he Government was somewhat negligent in this regard, but otherwise was making active attempts to locate the defendant and execute the warrant." *Id.* On appeal, the Eleventh Circuit affirmed the district court, stating, "We agree that the government could have been more diligent in trying to locate and arrest Bibb. In the absence of bad faith, however, the district court properly

---

[3] In any event, the court notes that once the USMS finally concluded that it was necessary to take more aggressive steps to locate Defendant, it spoke with his daughter.

determined that this factor did not weigh heavily against the government." *Bibb,* 194 F. App'x at 622.

Even if the Government in the instant case resembled the Government in *Bibb* in that it "could have been more diligent in trying to locate and arrest" Defendant (which is not the court's view), the USMS made active attempts to locate and arrest Defendant. Specifically, the USMS surveilled multiple locations, inquired with two different local housing authorities, listed Defendant's information on NCIC, and ran car tag information at various properties. Thus, even considering any potentially negligent acts of the Government while weighing this factor, the court does not find that the reasons provided weigh heavily against the Government.

Defendant also attempts to compare his post-indictment delay to that of the defendant in *United States v. Ingram* and argues that, as in that case, the first three *Barker* factors weigh heavily against the Government. However, this comparison is inapposite due to material factual dissimilarities between the cases. In *Ingram*, the defendant's case was "misplaced" for two years even though an ATF agent had visited the defendant at his place of work, where the defendant gave the agent his home address, his home phone number, and his cellphone number. *United States v. Ingram*, 446 F.3d 1332, 1335 (11th Cir. 2006). Even after the defendant in *Ingram* was eventually indicted, the ATF agent made minimal efforts to contact the defendant, despite the defendant's cooperation with them. *Id.* For example, after the ATF agent visited the defendant's residence (which the defendant owned) and was told by someone that the defendant no longer lived there, the agent left and never returned to the residence. *Id.* And, after the defendant left the ATF agent a voicemail, which included his cell phone number and his employer's address, the agent went to the defendant's place of work but did not get out of his car. *Id.* Finally, in none of those phone calls or visits in *Ingram* did the ATF agent inform the defendant that he had been

indicted. *Id.* Only after the ATF agent finally told the defendant that he had been indicted did the defendant agree to surrender in court several days later. *Id.*

As Defendant in this case acknowledges, the post-indictment delay in *Ingram* was about two years, and the delay in the present case is almost exactly two years. However, contrary to Defendant's assertion, that is where this case's similarity with *Ingram* ends. In *Ingram*, the Government candidly conceded that the pre-indictment delay occurred because the defendant's case was "misplaced." *Id.* Here, as the Government has explained, the pre-indictment delay occurred because of the COVID-19 pandemic and the effect that the pandemic had on the USMS. (Doc. # 34, pp. 36:22-40:11) (describing how the pandemic "slowed the process" of investigating the case). In addition, unlike in *Ingram*, where the investigatory agent merely left phone messages for the defendant and only went once to an address that the defendant had verbally told them was his home, *Ingram*, 446 F.3d at 1335, the USMS relied on every reasonable lead available to locate Defendant post-indictment. For example, the USMS surveilled the address included on Defendant's bond form in 2022, surveilled another address associated with Defendant in 2022, and returned to the original address associated with Defendant on multiple occasions in 2023. After learning that Defendant visited a particular gas station, the USMS surveilled that location in the hope of finding Defendant. In October 2023, an employee with the Jefferson County Housing Authority provided the USMS an address associated with Defendant's daughter. And finally, in January 2024, the USMS was able to get in contact with Defendant's daughter who called Defendant. In other words, unlike the agent in *Ingram* who failed to act diligently, the USMS followed all reasonable leads they were provided. Thus, any similarities between *Ingram* and the present case are negligible and bear no weight on the court's analysis for the second factor.

Finally, Defendant appears to question whether the COVID-19 pandemic negatively affected the USMS to the extent the Government argues. As the current Chief Judge of this District, and as a judicial officer who has served continuously in this district for twenty-one years, the court is well aware of all of the constituencies that the USMS is called on to serve – not only the judiciary, but also the public. For example, if there is a judicial conference, the USMS may be asked to serve as part of that conference's security detail. They may be assigned to guard the homes of and provide travel security for Justices of the Supreme Court of the United States. They may be assigned to provide security detail for special prosecutors. When there are hearings or trials in the courthouse involving in-custody defendants, two deputies for the USMS must be available to escort each defendant. And, most importantly, the court is aware of the staffing challenges that the USMS has experienced, especially during and immediately after the COVID-19 pandemic. These challenges would not have ceased immediately once the height of the pandemic had passed. The USMS continued to be affected in 2022 and 2023 by staffing issues that began during (and, to some extent, before) the pandemic. Reasonable diligence cannot be viewed in a vacuum as if a defendant and his counsel are the only ones in the universe or as if this case is the USMS's only responsibility.

Based on the court's analysis, this factor has a neutral effect, at best. The Government has provided valid reasons for the delay and the evidence shows that the Government did not act in bad faith. Therefore, Defendant must show actual prejudice to support a finding of unconstitutional post-indictment delay.

### 3. Assertion of the Right to Speedy Trial

The Government does not dispute that Defendant asserted his right to speedy trial. Thus, the third factor weighs heavily against the Government.

4.      **Actual Prejudice**

Because the first three factors do not all weigh heavily against the Government, the defendant must demonstrate actual prejudice. *See United States v. Harris*, 376 F.3d 1282, 1290 (11th Cir. 2004). When evaluating actual prejudice, courts consider the three interests of the defendant that the Speedy Trial statute is intended to protect: "(1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired." *United States v. Villarreal*, 613 F.3d 1344, 1355 (11th Cir. 2010).

Here, Defendant was not actually prejudiced with respect to the first interest. Defendant was arrested on January 29, 2024, and released on bond on May 2, 2024. More to the point, he was not incarcerated during the period the USMS was seeking to arrest him. These facts do not support a finding that Defendant's incarceration was oppressive.

Defendant was also not actually prejudiced with respect to the second interest. There is no evidence in the record that, before January 29, 2024, Defendant was aware of his Indictment, not to mention that Defendant presented no evidence of any anxiety or concern linked to this sealed Indictment. Thus, the relevant consideration in this case concerns the third interest: whether the post-indictment delay negatively impacted or impaired the defense.

When evaluating whether the delay impaired the defense, this court will only consider specific allegations of prejudice. There is a straightforward reason for this. Where the Government pursues its prosecution in good faith and with due diligence, the defendant must show specific prejudice, meaning something more than "conclusory allegations" such as "unsubstantiated allegations of witnesses' faded memories." *See United States v. Hayes,* 40 F.3d 362, 366 (11th Cir. 1994). "Mere conclusory allegations of impairment to one's defense are insufficient to prove actual

prejudice." *United States v. Kelly*, No. 21-10351, 2021 WL 6143554, at *2 (11th Cir. Dec. 30, 2021). When the court finds that the Government was negligent in its efforts, the court's tolerance for those negligent efforts "varies inversely with the length of the delay caused by that negligence." *United States v. Clark*, 83 F.3d 1350, 1353 (11th Cir. 1996) (citing *Doggett v. United States*, 505 U.S. 647, 657 (1992)). And, "[i]n cases of government negligence or bad faith, the reasons for the delay are critical and must be examined closely." *Id.* "[C]ourts should not lightly dispense with the actual prejudice requirement because to do so necessarily results in the 'severe remedy of dismissal of the indictment.'" *Ringstaff v. Howard*, 885 F.2d 1542, 1544-45 (11th Cir. 1989) (quoting *Barker v. Wingo*, 407 U.S. 514, 522 (1972)).

Here, Defendant cannot show that his defense was impaired by specific prejudice. Courts view impairment to the defense as "the most serious" factor that courts are to consider because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532. As to his argument regarding pre-indictment delay, Defendant relies on the purported destruction of security camera footage to show actual prejudice stemming from the post-indictment delay. However, there is nothing in the record to suggest that any video material relevant to this case was initially captured, much less that it was later deleted. So, for the same reasons the court mentioned above, Defendant's conclusory allegations about alleged evidence lost are "insufficient to prove actual prejudice." *Kelly*, 2021 WL 6143554, at *2.

Further, Defendant's arguments as to actual prejudice are contradictory. For example, Defendant claims as a general assertion of actual prejudice that his arrest interrupted his rehabilitation efforts. However, Defendant also appears to claim, as discussed above, that he was available and easily findable at the rehabilitation facility and thus should have been arrested sooner. This contradiction not only fails to establish actual prejudice, but also shows that because

of the post-indictment delay, Defendant was actually able to rehabilitate for a longer period. *See United States v. Vargas*, 97 F.4th 1277, 1296-97 (11th Cir. 2024) (noting that because the defendant was not incarcerated between his Indictment and arrest, he may have "*benefited* from the government's delay," *id.* at 1296). As in *Vargas*, Defendant was able to live freely during the post-indictment delay, residing in Bessemer and participating in rehabilitation efforts prior to his arrest. Thus, as regards Defendant's interrupted rehabilitation, Defendant fails to show specific prejudice.

Even when a defendant fails to establish pre-indictment delay, the court may still consider "inordinate pre-indictment delay" in its post-indictment analysis. *United States v. Ingram*, 446 F.3d 1332, 1339 (11th Cir. 2006); *United States v. Olivia*, 909 F.3d 1292, 1304 (11th Cir. 2018). Whether pre-indictment delay is considered inordinate depends on the circumstances of a particular case. *See Ingram*, 446 F.3d at 1339 (considering a two-and-a-half year delay inordinate given the simplicity of the defendant's crime and the investigation though the court did not consider the pre-indictment delay in its analysis); *see also Olivia*, 909 F.3d at 1305 (not considering the two-year pre-indictment delay inordinate because the case involved the conspiracy of two large-scale burglaries carried out by numerous individuals). In this instance, the pre-indictment delay is not inordinate. During a large portion of the pre-indictment investigation, an emergency global health pandemic affected numerous aspects of Officer Keith's investigation, from his ability to access resources to the health of himself and his family. *See Vargas*, 97 F.4th at 1291 ("As we see it, an emergency global health epidemic is exactly the kind of 'complicating factor' that would reduce the government's responsibility for a delay in making an arrest."). Thus, because the pre-indictment delay is reasonable given the circumstances, the court need not consider that delay in its analysis of actual prejudice.

Based on the evidence provided during the hearing, the court concludes that Defendant has not provided evidence of any specific prejudice he suffered because of a post-indictment delay. Defendant failed to show how his defense is impaired and failed to provide specific examples of how he suffered actual prejudice. Therefore, the court finds that the Government did not violate Defendant's Sixth Amendment Speedy Trial Right.

## IV.   Conclusion

For the reasons discussed above, Defendant's Motion to Dismiss the Indictment (Doc. # 16) is **DENIED**.

**DONE** and **ORDERED** this September 9, 2024.

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE